UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Jean A. Stavola, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:05cv998 (JBA) |
| | : | |
| Northeast Utilities, et al., | : | |
| Defendants. | : | |

### PHASE 1 FINDINGS OF FACT AND CONCLUSIONS OF LAW

Because there are two potentially dispositive factual issues in this ERISA case, the Court and the parties agreed that an evidentiary hearing (Phase 1) would be held in lieu of summary judgment motion practice as the more expeditious course. What follows are the Court's findings of fact and conclusions of law on these two issues, related to statute of limitations and the sufficiency of plaintiff's inquiry to trigger defendants' informational response duty.

### I.   Introduction

Plaintiff Jean A. Stavola ("Stavola") is a former long term employee of Northeast Utilities' ("NU") operating company, the Connecticut Light and Power Company ("CL&P"). CL&P is owned by Northeast Utilities and is a for-profit corporation with its principal place of business in Berlin, Connecticut.

The parties are in agreement that defendant CL&P's pension plan is covered under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., that CL&P is a plan

fiduciary, and that plaintiff Stavola is a plan beneficiary.  The parties have also stipulated that Stavola retired February 1, 1991, and that in October 1991, CL&P announced an early retirement program that Stavola could have participated in had she elected to postpone her retirement date.  See Joint Stip. ¶¶ 11-13.  Stavola claims that CL&P breached its fiduciary duty owed to her under ERISA by not informing her at the time she sought details regarding her retirement benefits that it had decided to implement or was seriously considering implementing an early retirement plan.

One of the obligations employers have under ERISA is a fiduciary duty with respect to retirement plans to act "solely in the interest of the participants and beneficiaries."  ERISA § 404, 29 U.S.C. § 1104.  This first phase hearing focused on two issues: (1) whether Stavola's claim is barred by the applicable statute of limitation under ERISA; and (2) whether Stavola's inquiry of Gerard Turner, CL&P's Human Resource Supervisor, concerning pension information was sufficient to trigger CL&P's duty to disclose under ERISA.

## II.  Findings of Fact

The evidence showed that plaintiff is a former employee of CL&P who retired effective February 1, 1991.  Joint Stip. ¶¶ 4-5, 11.  Stavola was employed at CL&P for forty years and turned 60 years old on December 27, 1990.  She enjoyed her work at CL&P as

a business office representative and tried to make the company "look good" when assisting its customers. Given her age and length of service with CL&P, she was eligible to receive pension benefits under the Northeast Utilities System Retirement Plan. Id. ¶ 7.

In the Fall of 1990, Stavola contacted Gerard Turner in the Human Resources department "for her retirement papers," and Turner told Stavola to put her request in writing. Accordingly, on October 22, 1990, Stavola sent a letter to Turner which stated: "In order that I can make a decision as to my retirement plans, will you please provide me with retirement figures for February 1, 1991, and for February 1, 1993 at your earliest convenience." Joint Ex. 1; Joint Stip. ¶ 8. On November 1, 1998, plaintiff informed Turner that she planned to retire on February 1, 1991, "with the stipulation of withdrawing upon receiving [her] figures." Joint Ex. 2; Joint Stip. ¶ 9. On November 13, 1990, Turner provided plaintiff with a retirement computation based upon a retirement date of February 1, 1991. Joint Ex. 3; Joint Stip. ¶ 10. Stavola testified that she contacted Turner to ask him why he had only provided 1991 figures, and he told her that there would not be much of a change in the figures and told her to "go for it" (i.e. go for retiring in 1991). Stavola reasoned that if there would not be much of a change between retiring in 1991 and later, she might as well

3

retire at 60, instead of waiting.  She retired from CL&P effective February 1, 1991.  Joint Stip. ¶ 11.

Subsequently, on September 30, 1991, the Northeast Utilities Service Company approved a Special Retirement Program, which program was announced in October 1991.  Id. ¶¶ 12-13.  Plaintiff learned of the program shortly after it was announced.  Id. ¶ 14. Then, in March 1996, plaintiff saw a Moukawsher & Walsh, LLC announcement in The Day, a New London newspaper, which stated: "If You: . . . Missed out on a Company Separation Option (Golden Handshake) Because of Your Retirement Date [or] Retired No More than 18 Months before the Company Announced the Separation Option ('Golden Handshake'), You May Be Entitled to Additional Benefits."  Joint Ex. 4; Joint Stip. ¶ 15.  The announcement also provided: "You may be entitled to make a claim under the Employee Retirement Income Security Act (ERISA) for your employer's failure to provide you benefits under the company's separation option or 'golden handshake.'  Claims are being filed now," and provided the toll-free telephone number of Attorney Moukawsher's law firm.  Joint Ex. 4.

On seeing this announcement, plaintiff wrote to Cheryl Grisé (then Senior Vice President and Chief Administrative Officer of Northeast Utilities Service Company), asking whether she should have been included in this 1991 special retirement program. Joint Ex. 5; Joint Stip. ¶ 16.  Plaintiff stated "[r]ecently

4

during some conversations relating to the calculation of my
pension, questions were raised about the applicability in those
calculations of the 'Golden Handshake' offered later in 1991 to
others and which had not been offered to me," and she also
referenced ERISA.  Joint Ex. 5.  By letter dated April 16, 1996,
Grisé responded to plaintiff, telling her that Keith Coakley, the
Human Resources Director, had investigated plaintiff's questions,
and advised plaintiff that while she had retired in February
1991, "no decision was made until much later in 1991 concerning
the retirement program that was announced on October 1, 1991.  As
is our established practice, we provided the extra benefits to
any employee in an eligible position who happened to retire
immediately after the decision to offer a program was made.
There had been no such decision before you retired in February of
1991, and we have confirmed that no additional benefits are
payable to you from the retirement plan."  Joint Ex. 6; Joint
Stip. ¶ 17.  Plaintiff testified that at the time, she took
Grisé's word for it because she knew Grisé was a senior vice
president and thought she "should know" and had no reason not to
"take her word for it."  Plaintiff's sister, also an NU employee,
inquired of other human resources representatives about the
golden handshake and plaintiff's retirement benefits; when those
individuals assured plaintiff's sister that plaintiff had
received everything to which she was entitled, plaintiff believed

them because she had no reason to believe that were not telling her the truth.

A few months later, on September 24, 1996, another article appeared in The Day, entitled "Suit says NU hid retirement incentives," which discussed a lawsuit brought by NU retirees for benefits under the 1991 retirement program and identified Attorney Moukawsher as counsel for the plaintiffs.   Joint Ex. 7; Joint Stip. ¶ 18.  The article, which plaintiff's brother-in-law who also worked for NU gave to her, stated, inter alia, "Northeast Utilities withheld information about early retirement incentives from employees who were nearing retirement age, a local attorney has charged in a lawsuit filed on behalf of a dozen former NU employees."  Joint Ex. 7.  The article also provided "[u]nder the Employment Retirement Income Security Act, the company must tell employees if an early retirement plan is being prepared.  Under the pension law, the company has a financial responsibility to the employee, not just an employment contract, Moukawsher said."  Id.  Plaintiff read this article on or shortly after the date of publication.  Joint Stip. ¶ 19.  She testified on cross examination that after reading the article, she no longer believed what Grisé had told her, and "[she] thought [she] should be part of th[e] case [described in the

article]."[1]

Around the same time period, on September 26, 1996,
plaintiff received a letter from Attorney Moukawsher soliciting
information that might be relevant to his clients' suits.  The
letter stated "[y]our assistance may help other former employees
like you to recover benefits under the program.  According to
federal law, once the program was being seriously considered by
the company, NU was required to inform you that the program was
'in the works' in response to your questions about retirement.
Any employee the company failed to inform who then retired in
ignorance of the plan, is entitled to recover benefits.  We
represent employees in this category.  If you also were not told
or were otherwise misled your information is valuable."  Joint
Ex. 8; Joint Stip. ¶¶ 20-21.  The questionnaire posed a series of
questions relating to plaintiff's retirement, including what
inquiries she had made regarding enhanced retirement benefits
before she retired.  Joint Ex. 8.  Plaintiff indicated that she
was not told that a special incentive program was being
considered, nor had she heard rumors about one; she also stated
that she would have delayed her retirement until October 1991 if

---

[1] Although this was plaintiff's testimony on cross
examination, plaintiff admitted on redirect examination that she
was confused about the dates, and therefore it is not clear
whether she actually attributed her belief to the 1996 article,
or whether she came to disbelieve Grisé only after reading a 2004
article discussed below.

she had known a special incentive program "was coming."  Id.

Then, more than seven years later, in April 2004, plaintiff read an article in the Hartford Courant entitled "15 NU Retirees Win in Court."  Joint Ex. 11; Joint Stip. ¶ 26.  The article detailed a bench trial decision by United States District Court Judge Dominic J. Squatrito finding that NU had "deliberately withheld information [from retirees] about enhanced retirement packages they would have been eligible to receive had they waited a few more months to retire."  Joint Ex. 11.  The article further summarized judicial findings that "[r]etirees asking about enhanced retirement packages in 1991, 1993, and 1994 were directed to human resources staff, but the staff had been deliberately kept in the dark about them."  Id.  Plaintiff testified that this was the first time she realized the company had deliberately withheld information from her about the 1991 package, and she decided to get in touch with Attorney Moukawsher because she "wanted fairness" after 40 years of service.  She retained Attorney Moukawsher in May 2004, and filed this action in June 2005.

Subsequent to plaintiff's retirement, CL&P had sent her a questionnaire entitled "Statement In Support Of Claim For Retroactive Retirement Benefits Under the Northeast Utilities Service Company Retirement Plan."  Joint Ex. 9; Joint Stip. ¶ 23.  In January 2005 plaintiff completed the questionnaire under oath

and Attorney Moukawsher returned it to NU.  Plaintiff answered
questions concerning her pre-retirement inquiries, including
stating that before she retired she asked Turner about retirement
benefits because she "was attempting to pick the date that would
get [her] the maximum benefits [she] could get. [She] told Turner
[she] was trying to choose between retiring immediately and
waiting. [She] asked him to give [her] all the information [she]
would need to make that choice but he never mentioned that it
might be worth waiting a few months to see if the company decided
to offer a severance package."  Joint Ex. 9 at 2.  Plaintiff also
indicated that she "spoke with Moukawsher & Walsh, LLC in early
1996.  But after [her] correspondence with Grise and [her]
sister's contacts with the company [she] chose to believe [t]hat
the company told [her] the truth when it said [she] was not
entitled to anything more than what [she] received.  However,
after reading in the Hartford Courant in April 2004 that a Judge
awarded the same group of people benefits under the same
circumstances, [she] contacted Moukawsher & Walsh, LLC again."
Id. at 3.

## III. Conclusions of Law

### A.   Actual Knowledge

ERISA § 413(2), 29 U.S.C. § 1113(2), provides:

No action may be commenced under this subchapter with
respect to a fiduciary's breach of any responsibility,
duty, or obligation under this part, or with respect to
a violation of this part, after the earlier of –

9

(1) six years after (A) the date of the last action
which constituted a part of the breach or violation, or
(B) in the case of an omission the latest date on which
the fiduciary could have cured the breach or violation,
or
(2) three years after the earliest date on which the
plaintiff had actual knowledge of the breach or
violation;

except that in the case of fraud or concealment, such
action may be commenced not later than six years after
the date of discovery of such breach or violation.

Defendants contend that plaintiff's action is barred by §

413(2) because plaintiff had actual knowledge of the alleged

breach more than three years before she commenced this action in

June of 2005.  Specifically, defendants argue that plaintiff had

"actual knowledge" of the breach in 1996, after: seeing the

Moukawsher & Walsh, LLC announcement representing that NU

retirees might be entitled to additional retirement benefits,

which referenced ERISA and noted "[c]laims are being filed now,"

see Joint Ex. 4; reading the September 24, 2996 article, entitled

"Suit says NU hid retirement incentives," which discussed a

lawsuit brought by NU retirees for benefits under a 1991 enhanced

early retirement program and identified Attorney Moukawsher as

counsel for the plaintiffs, see Joint Ex. 7; and receiving the

letter from Attorney Moukawsher informing her that a number of

former NU employees had brought suits to recover benefits under

its October 1991 early retirement program and that any employee

whom the company failed to inform and who then retired without

knowledge of the anticipated early retirement plan would be

10

entitled to recover benefits, <u>see</u> Joint Ex. 8.  Defendants bear the burden of proving this affirmative defense.

Plaintiff contends that these facts are insufficient to establish actual knowledge because after seeing the Moukawsher & Walsh, LLC announcement, she contacted Grisé, who assured her that she had received all benefits due to her and did not have a right to any additional benefits.  <u>See</u>  Joint Ex. 6.  Plaintiff argues that she did not have actual knowledge of CL&P's potential breach until reading in April 2004 the <u>Hartford Courant</u> article ("15 NU Retirees Win in Court") describing the decision in <u>Broga v. Northeast Utilities</u>, 315 F. Supp. 2d 212 (D. Conn. 2004), holding that NU had breached its fiduciary duty to its retiring employees by "deliberately with[holding] information about enhanced packages [retirees] would have been eligible to receive had they waited a few more months to retire."  Joint Ex. 11.

The Second Circuit has held that "[a] plaintiff has actual knowledge of the breach or violation within the meaning of ERISA § 413(2), 29 U.S.C. § 1113(2), when he [or she] has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act. . . . While a plaintiff need not have knowledge of the relevant law, . . . he [or she] must have knowledge of all facts necessary to constitute a claim.  Such material facts could include necessary opinions of experts, knowledge of a

transaction's harmful consequences, or even actual harm. However, the disclosure of a transaction that is not inherently a statutory breach of fiduciary duty . . . cannot communicate the existence of an underlying breach." Caputo v. Pfizer, Inc., 267 F.3d 181, 193 (2d Cir. 2001). "[A]n ERISA plaintiff cannot be said to have actual knowledge of the breach or violation until he [or she] has actual knowledge that his [or her] employer misrepresented a present fact or failed to disclose all material information known at the time of inquiry." Id.; see also Int'l Union v. Murata Erie N. Am., 980 F.2d 889, 900 (3d Cir. 1992) ("Actual knowledge of a breach or violation requires knowledge of all relevant facts at least sufficient to give the plaintiff knowledge that a fiduciary duty has been breached or ERISA provision violated.") (internal citation omitted). Accordingly, CL&P must show that Stavola knew not only of the relevant events that occurred, but also that those events supported a claim for breach of fiduciary duty or violation under ERISA. Constructive knowledge, i.e. that plaintiff should have known, is insufficient.[2] The parties agree that under Caputo and its progeny, the "actual knowledge" standard is a subjective one.

The announcement of the early retirement plan in October

---

[2] Caputo rejected a "constructive knowledge" theory, based on the date a plaintiff "should have known that [its employer] may have breached its fiduciary duty," finding that "[t]his interpretation is repugnant to the plain language of the statute as well as its legislative history."  267 F.3d at 194.

12

1991 itself was not "inherently suspect," nor did it constitute a
breach of fiduciary duty on its own – "[a]lthough the
announcement should have (and did) give plaintiff[] reason to
suspect that [defendants] had lied to [her], it is not enough
that [she] had notice that something was awry; [she] must have
had specific knowledge of the actual breach of duty upon which
[she] sued."  Caputo, 267 F.3d at 193; accord Broga, 315 F. Supp.
2d at 222 (knowledge of the early retirement plan when it was
announced was insufficient to constitute actual knowledge of
breach of fiduciary duty, "[plaintiffs] must have had some sort
of specific knowledge that elevated their suspicion to actual
knowledge").

        The spring 1996 Moukawsher law firm announcement obviously
caused plaintiff to question whether something was "awry," so she
contacted Grisé, but when Grisé then assured her that she had
been given all benefits to which she was entitled, she believed
her.  Her repose of trust in the advice of a CL&P executive was
grounded in her positive experience of more than 40 years of
employment at CL&P, her numerous family members' employment at
CL&P and, as she repeated often in her testimony, she had no
reason to not credit CL&P.  However, plaintiff also testified
that after reading the September 1996 article about the lawsuit
by other former employees and receiving the letter and
questionnaire from Attorney Moukawsher, she no longer believed

that Grisé had told her the truth and she thought that she should
be part of the case described in the article.  Nevertheless, she
did not bring suit until 2005, and attributed her decision to do
so to the 2004 article she read about Judge Squatrito's decision
in Broga.  Plaintiff identified the critical difference between
the 1996 article, to which defendants attribute plaintiff's
actual knowledge, and the 2004 article, as the finding reported
in the 2004 article that "the company deliberately withheld
information about enhanced packages."  Joint Ex. 11.

Based on Caputo and its progeny, the Court concludes that
plaintiff's reading the 1996 article and Attorney Moukawsher's
letter, completing Attorney Moukawsher's questionnaire, and
testifying that she no longer believed Grisé and thought she
should be part of the group of plaintiffs suing in 1996, is
insufficient to establish plaintiff's actual knowledge.  First,
any suspicions plaintiff may have had of NU/CL&P wrongdoing after
reading Moukawsher's announcement in spring 1996 were, as she
testified, quelled by Grisé's assurances in April.  See Broga,
315 F. Supp. 2d at 222 ("The fact that a few of the Plaintiffs
consulted lawyers is of no consequence.  Each time a Plaintiff
consulted an attorney NU contacted the Plaintiff shortly after
and assured the Plaintiff that there were no legal improprieties,
thus diminishing any belief the Plaintiffs might have had [that]
a legal claim existed.").

14

Further, although the September 1996 article and letter from Attorney Moukawsher identified the relevant legal provisions and theory of the NU employee lawsuit, plaintiff's testimony does not demonstrate that as a result of the content of these documents she knew NU/CL&P had deliberately misrepresented or withheld from her material information concerning the October 1991 golden handshake thus violating its ERISA fiduciary disclosure duty to her.  While plaintiff "need not have knowledge of the relevant law," she must have had "actual knowledge that [NU/CL&P] misrepresented a present fact or failed to disclose all material information known at the time of the inquiry."  Caputo, 267 F.3d at 193; Int'l Union, 980 F.2d at 900 (plaintiff must have knowledge of "all relevant facts at least sufficient to give [her] knowledge that a fiduciary duty has been breached or ERISA provision violated").  Although plaintiff may have suspected that she had not been given all relevant information when she made her retirement timing inquiry, and although in September 1996 she became aware of others' factual allegations and testified that she no longer believed what Grisé had told her (that she was not entitled to any additional benefits),[3] defendants have not

---

[3] Further, as noted above (see supra note 1), plaintiff's trial testimony demonstrated her confusion about dates and chronologies, and although she testified that she no longer believed what Grisé had told her in April 1996 after reading the September 1996 article about the filing of the Broga action, she corrected her testimony to refer to the 2004 article concerning the Broga verdict.  In any event, this testimony is insufficient

established that before 2004 plaintiff had "actual knowledge" of a key fact in her claim – that NU/CL&P misled her by deliberately withholding information from her about the 1991 plan at the time she was deciding when to retire.

Indeed, when asked about the difference to her between the 1996 article and the 2004 article, plaintiff referred to exactly this sentence in the 2004 article concerning the finding of deliberate withholding of information.  Plaintiff also explicitly testified that the first time she realized the company had deliberately withheld information about the 1991 early retirement program was when she saw the 2004 article.  Until that time, unaware that in 1991 NU/CL&P had deliberately withheld information from prospective retirees about enhanced benefits that would be available if they delayed their retirements, Stavola did not have actual knowledge that defendants had "failed to disclose all material information known at the time of [her] inquiry," a material fact necessary to an ERISA breach of fiduciary duty claim.  Caputo, 267 F.3d at 193-95 (holding "plaintiffs did not have actual knowledge of Pfizer's breach until they learned during the Mullins trial in 1995 that Pfizer anticipated the offering of the 1991 VSO as early as the Spring of 1990; and, therefore, it arguably misrepresented present facts

_____

to establish plaintiff's actual knowledge of deliberate material misrepresentations to her.

when responding to plaintiffs' inquiries," reasoning, "[w]e do not hold today that ERISA plaintiffs cannot bring an action until they receive information that would not normally be obtained only after conducting discovery.  Nor are we saying that the plaintiffs in this case could not in good faith have commenced an action upon learning of the 1991 VSO. . . . Rather, we conclude only that the district court erred in holding that, as a matter of law, plaintiffs are barred from filing their action under ERISA's three-year 'actual knowledge' statute of limitations"); cf. Int'l Union, 980 F.2d at 901 (rejecting defendant's three-year statute of limitations argument, finding "[defendant] has made no showing that plaintiffs actually knew what their lawyers now contend – that any amendment to the Plan documents was a breach of fiduciary duty").

Thus, neither as a matter of law or fact have defendants proved the statute of limitations affirmative defense.

**B.   Existence of Fiduciary Duty**

Defendants also argue that the nature of Stavola's inquiry to Mr. Turner in 1990 regarding retirement benefits was insufficient to trigger a fiduciary duty to disclose any information regarding NU's consideration of an early retirement plan.

ERISA § 404, 29 U.S.C. § 1104(a), provides that employers have a fiduciary duty with respect to retirement plans to act

17

"solely in the interest of the participants and beneficiaries."
"It is well-settled that plan fiduciaries may not affirmatively
mislead plan participants about changes, effective or under
consideration, to employee pension benefits." <u>Pocchia v. Nynex
Corp.</u>, 81 F.3d 275, 278 (2d Cir. 1996).  Employers who "make
affirmative material misrepresentations about proposed future
changes to an employee benefit plan" breach their fiduciary duty
to their employees.  <u>See</u> <u>Ballone v. Eastman Kodak Co.</u>, 109 F.3d
117, 122 (2d Cir. 1997).  Similarly, "courts have found that
omissions may be actionable, as well as affirmative statements. .
. . For example, in <u>Becker v. Eastman Kodak</u>, 120 F.3d 5 (2d Cir.
1997), the Second Circuit found a breach of fiduciary duty based
partially on the fact that the benefits counselor failed to
provide complete and accurate information about the mechanics and
timing of the election to retire." <u>Mullins v. Pfizer, Inc.</u>, 147
F. Supp. 2d 95, 108 (D. Conn. 2001).

However, "a fiduciary is not required to voluntarily
disclose changes in a benefit plan before they are adopted."
<u>Pocchia</u>, 81 F.3d at 278.  Additionally, although "a plan
administrator may not make affirmative material
misrepresentations to plan participants about changes to an
employee pension benefits plan. . . . [W]e do not require an
ERISA fiduciary to be perfectly prescient as to all future
changes in employee benefits. . . . Nor do we require a fiduciary

to disclose its internal deliberations or to interfere with the substantive aspects of the collective bargaining process.  We do, however, hold that when a plan administrator speaks, it must speak truthfully."  Mullins v. Pfizer, Inc., 23 F.3d 663, 669 (2d Cir. 1994).

Nevertheless, courts in this District have rejected the argument that employees must make specific inquiries using "magic words" in order to trigger an employer's fiduciary duty.  See, e.g., Hudson v. General Dynamics Corp., 118 F. Supp. 2d 226, 243 (D. Conn. 2000) (rejecting defendant's argument, based on Pocchia, "that beneficiaries must make specific inquiries, using terms and words, in order to trigger any duty on the part of the employer to disclose potential plan changes prior to plan adoption," refusing to "cull such a requirement from the language of [Pocchia]").  In Broga, the district court concluded that "the fact that [plaintiff] at some point[] failed to ask precisely the right questions does not mean that responses to those questions cannot be misstatements.  To hold otherwise would place too high a burden on employees, and is contrary to ERISA's fiduciary principles. . . . To accept NU's position would punish some plaintiffs for failing to use so-called 'magic words,' while others who asked better-informed or 'sophisticated' questions would prevail.  This would be especially unfair in light of NU's conscious efforts to keep employees unaware of future plan

changes:  The same ignorance that precipitated the need for answers often limits the ability to ask precisely the right questions."  213 F. Supp. 2d at 244.

In this case, plaintiff's testimony established that she had not made up her mind about her retirement date, only that she planned to retire sometime in the years after she turned 60 and was willing to wait if doing so would mean an increase in benefits.  Accordingly, she called Turner in the fall of 1990 and asked him to give her the pension benefits information that she would need to choose between retiring at age 60 or 62.  After being instructed to put her request in writing, plaintiff sent Turner a letter in October 1990, which stated: "I will reach the age of 60 on December 27, 1990 after 40 years of service with Northeast Utilities.  In order that I can make a decision as to my retirement plans, will you please provide me with retirement figures for February 1, 1991, and for February 1, 1993 at your earliest convenience."  Joint Ex. 1 (emphasis added).

This request clearly indicated to Turner that plaintiff was undecided as to her retirement date and was making her decision based on amount of benefits.  Turner's understanding of her purpose was evidenced by his response that there would not be a financial difference justifying delay in retirement.[4]  Thus,

_____

[4] Although defendants sought to demonstrate on cross examination and through excerpts from plaintiff's deposition that plaintiff was confused and did not in fact ever speak to Turner

while her inquiry was not focused on whether an early retirement ("golden handshake") plan was under consideration, having heard no rumors, her inquiry was sufficient to put Turner on notice that increases in her retirement benefits or other retirement incentives were material to her and would drive her decision of when to retire.  See, e.g., Hudson, 118 F. Supp. 2d at 244 ("None of the plaintiffs here have conceded that they had made up their minds that retirement incentives would not [be] offered, and thus were not seeking such information when they met with retirements counselors.  To the contrary, many plaintiffs testified to their awareness of rumors, regarding possible retirement enhancements, and some plaintiffs claim that they were attempting to obtain all relevant information that would aid them in maximizing their benefits and making the decision about whether or when to retire.") (emphasis added).  Accordingly, Stavola's inquiry was sufficient to trigger defendants' fiduciary duty under ERISA.

---

about her retirement benefits (either before her written inquiry or after his response), the Court finds plaintiff's testimony credible.  Notwithstanding that plaintiff was testifying about these matters 15 years after she retired at age 60, and clearly became confused about dates when testifying about the two different newspaper articles and whether/when she spoke with Coakley or Turner, she testified on direct examination that she spoke to Turner twice – once before sending her October 1990 letter, at which point he instructed her to inquire in writing, and once after she received his response to ask why he had not provided 1993 figures.  This testimony is corroborated by the context and nature of her written inquiry (plaintiff would not have known to make the inquiry in writing if not so instructed by Turner) and Turner's response to her (which did not include both sets of figures that she had requested).

## IV.   Conclusion

For the foregoing reasons the Court finds that defendants' evidence is insufficient to establish the statute of limitations defense because defendants cannot prove that plaintiff had "actual knowledge of the breach or violation," ERISA § 413(2), 29 U.S.C. § 1113(2), more than three years prior to filing suit. The Court also finds that plaintiff's inquiry to Mr. Turner in October 1990 was sufficient to trigger a fiduciary duty under ERISA.

Accordingly, this case shall proceed to a second phase in which it will be determined whether defendants breached their fiduciary duty to plaintiff under ERISA.  The parties' Joint Trial Memorandum is due 10/27/06 and a pre-trial conference will be held on 11/15/06 at 11 a.m. in Courtroom Two, United States District Courthouse, 141 Church Street, New Haven, Connecticut.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 3rd day of October, 2006.**